RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HODA MOSTAFA (03-4004); ABDOLMAJID ALSAF
(03-4006);

                  *Petitioners,*

    *v.*

JOHN ASHCROFT,

                  *Respondent.*

Nos. 03-4004/4006

On Petition for Review of an Order of the Board of Immigration Appeals.
Nos. A72 655 008; A72 655 009.

Argued: December 7, 2004

Decided and Filed: January 24, 2005

Before: MARTIN and MOORE, Circuit Judges; BUNNING, District Judge.[*]

_____

### COUNSEL

**ARGUED:** E. Dennis Muchnicki, Dublin, Ohio, for Petitioners. Alison R. Drucker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** E. Dennis Muchnicki, Dublin, Ohio, for Petitioners. Alison R. Drucker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Donald Keener, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent.

_____

### OPINION

_____

    BOYCE F. MARTIN, JR., Circuit Judge. Abdolmajid Alsaf and his wife, Hoda Mostafa, who are natives and citizens of Iran, petition for review of an order of the Board of Immigration Appeals denying their claim for relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. For the following reasons, we GRANT the petition for review, VACATE the Board's decision and REMAND for further proceedings consistent with this opinion.

_____

[*]The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I.

Petitioners entered the United States pursuant to visas in 1994, but remained in this country longer than their visas permitted. Accordingly, in December 1995, they were charged with being deportable under section 241(a)(1)(B) of the Immigration and Nationality Act. In May 1997, following a deportation hearing, an immigration judge issued an order denying petitioners' requests for asylum and withholding of deportation, but granting the privilege of voluntary departure. That decision was affirmed by the Board of Immigration Appeals in September 1998. Petitioners filed a petition for review in this Court, which was denied in 2000.

Meanwhile, on June 18, 1999, petitioners—as permitted by new regulations—filed with the Board a motion to reopen the immigration proceedings to apply for protection under the Convention Against Torture. Although this motion was made on behalf of both petitioners, Mostafa's claim for relief under the Convention Against Torture is entirely derivative of that of her husband, Alsaf. On November 5, 1999, the Board granted the motion to reopen, and a Convention Against Torture hearing subsequently took place before an immigration judge.

At the hearing, Alsaf testified that prior to arriving in the United States he lived in Iran and worked for a company called Afshein, which was owned in part by his sister-in-law. In his capacity as an Afshein representative, Alsaf obtained from various Iranian parties deposits on Craftsman tools that were to be imported from the United States to Iran, and transferred those funds to Afshein. Subsequently, the United States government—which had been investigating Afshein for trading in banned materials—shut down Afshein's United States business and seized its assets, including the funds collected by Alsaf. Alsaf then came to the United States to investigate new business opportunities. While in this country, he was subpoenaed by a grand jury concerning Afshein's role in trading in banned materials. An indictment ultimately issued against a number of individuals, including Alsaf's sister-in-law and a middleman who allegedly had extensive contacts within the Iranian government. In May 1995, the Iranian government seized all of Afshein's Iranian assets to cover the deposits that were seized in the United States. Alsaf testified that, in light of these events, "now the Iranian government see[s] me as [an] American that gave information about Iranians . . . and they see me as a traitor, the one who just gave all the information to the U.S. Government."

Alsaf also testified about an incident that allegedly occurred in November 1998, when he attempted to renew his passport at an Iranian passport office located in the Pakistani Embassy in Washington, D.C. According to Alsaf, when he tried to renew his passport, he was told that he was on a list as someone who had sought asylum, and he was given a form to explain why. He was told that his passport could not be renewed until he completed the form, but he refused to do so and left. The record contains an affidavit from an individual named Ciorus Haghnazari, who allegedly witnessed the events that transpired at the passport office. That affidavit provides as follows:

> It happened just like Mr. Alsaf said. The men took Alsaf's old passport to a back room. They came back and said that they knew he had filed asylum with the United States. They said he must fill out the form explaining why he had done this to Iran. They told him that they would not renew his passport if he did not fill out form. When Mr. Alsaf would not fill out form, they refused his new passport.

In Alsaf's view, the Iranian officials' awareness that he had previously filed an application for asylum indicates that the Iranian government had been tracking his activities while in the United States.

On August 20, 2001, the immigration judge rendered an oral decision denying Alsaf's application for relief under the Convention Against Torture. On June 27, 2003, the Board of

Immigration Appeals issued an opinion dismissing Alsaf's appeal, holding that he "failed to prove that he more likely than not faces 'torture' in Iran." This petition for review followed.

## II.

In considering a petition for review of a decision of the Board of Immigration Appeals, we review the Board's legal determinations de novo, *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004), and its factual findings under the substantial evidence standard, *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004). The substantial evidence standard requires us to uphold the Board's findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992). "To reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the facts were as the alien alleged." *Khodagholian v. Ashcroft*, 335 F.3d 1003, 1006 (9th Cir. 2003) (citations omitted).

Article 3 of the Convention Against Torture prohibits the return "of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official." *Matter of G-A-*, 23 I. & N. Dec. 366, 367 (BIA 2002) (en banc) (citations omitted). Applicable regulations define "torture" as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). As the Board has explained,

> [i]n determining whether an alien is entitled to protection under the Convention Against Torture, all evidence relevant to the possibility of future torture in the proposed country of removal shall be considered, including, but not limited to: past torture inflicted upon the applicant; evidence that the applicant could relocate to another part of the country of removal where he or she is not likely to be tortured; gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in the country of deportation.

*Matter of G-A-*, 23 I. & N. Dec. at 367 (citing 8 C.F.R. § 208.16(c)(3)).

In his petition for review, Alsaf argues that the Board's opinion fails to give adequate consideration to the country conditions in Iran, which are discussed extensively in the Board's 2002 opinion in *Matter of G-A-*. Indeed, the Board's opinion in this case contains absolutely no discussion of the country conditions in Iran, nor does it cite *Matter of G-A-* despite the obvious relevance of that opinion to the present case. In *Matter of G-A-*, the en banc Board recognized the extensive human rights abuses committed by the Iranian government, including such "'systematic abuses'" as "'extrajudicial killings and summary executions; disappearances; widespread use of torture and other degrading treatment, reportedly including rape; harsh prison conditions; arbitrary arrest and detention, and prolonged use of incommunicado detention.'" *Id.* at 368-69 (quoting Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, Iran Country Reports on Human Rights Practices - 1999, at 1-2 (Feb. 25, 2000) ("1999 Country Reports")). The Board also noted that Iran's judicial system "is subject to government and religious influence and . . . fails to ensure due process or fair trials," and that "many criminal offenses result in harsh punishments,

including stoning and flogging." *Id.* at 369 (citing 1999 Country Reports, at 2). Finally, the Board explained "that Iranian citizens returning from abroad are 'subject to search and extensive questioning by government authorities for evidence of antiregime activities abroad,'" *id.* (quoting 1999 Country Reports, at 19), and that the Iranian government has "arrested, imprisoned, tortured, and sometimes killed Iranians who were forcibly returned to Iran after departing Iran unlawfully, staying abroad without authorization, and/or *applying for asylum in another country*," *id.* (quoting The Status of Human Rights of Ethnic Armenian/Assyrian Christians in the Islamic Republic of Iran, at 26) (emphasis added).

Although the 1999 Country Reports for Iran that the Board so extensively discussed in *Matter of G-A-* are included in the record in this case, those reports were never mentioned in the Board's opinion. Also included in the record—but not mentioned in the Board's opinion—are the 2000 Country Reports, which indicate that the problems documented in the 1999 Country Reports and discussed in *Matter of G-A-* continued to persist. Under these circumstances, we must conclude that the Board failed to analyze Alsaf's Convention Against Torture claim in light of relevant country conditions and applicable legal precedent. Had the Board properly considered "all evidence relevant to the possibility of future torture" in Iran, *Matter of G-A-*, 23 I. & N. Dec. at 367; *accord* 8 C.F.R. 208.16(c)(3), it might have adjudicated Alsaf's claim differently. Thus, the appropriate course of action is to remand this case to the Board for proper consideration of Alsaf's claim. *See, e.g., Zubeda v. Ashcroft*, 333 F.3d 463, 477-78 (3d Cir. 2003) (remanding where the Board's opinion "totally ignores . . . reports from government agencies and human rights organizations that detail what appear to be country wide, systematic incidents of gang rape, mutilation, and mass murder"); *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001) (remanding where "nowhere in its opinion did the [Board] consider the documented country conditions in Sri Lanka which corroborate the widespread practice of torture against Tamil males"); *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) (remanding where the Board's opinion failed to discuss a state department report detailing country conditions in Iraq, and observing that "had the [Board] addressed the Report it might have viewed [the applicant's] torture claim differently").

## III.

Given the foregoing, Alsaf's petition for review is GRANTED, the Board's decision is VACATED and the case is hereby REMANDED to the Board with instructions to analyze Alsaf's Convention Against Torture claim in light of the relevant country conditions in Iran as documented in the 1999 and 2000 Country Reports, among other relevant materials, and in light of its opinion in *Matter of G-A-*.