NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0393n.06

No. 16-4055

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 03, 2017
DEBORAH S. HUNT, Clerk

MARK WRIGHT,

     Petitioner,

v.

JEFFERSON B. SESSIONS, III,
Attorney General,

     Respondent.

ON PETITION FOR REVIEW FROM THE
BOARD OF IMMIGRATION APPEALS

_____/

BEFORE:    BOGGS, CLAY, and SUTTON, Circuit Judges.

     **CLAY, Circuit Judge.**  Petitioner Mark Wright ("Wright"), a native and citizen of Jamaica, petitions for review of the decisions of the Board of Immigration Appeals ("BIA") and an immigration judge ("IJ") denying his application for relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, p. 20, 1465 U.N.T.S. 85; 8 CFR § 208.17. On appeal, Wright argues that the BIA and IJ erred in determining that Wright had failed to show that it was more likely than not that he would be subject to torture if removed to Jamaica. Wright argues that we have subject-matter jurisdiction over his petition pursuant to 8 U.S.C. § 1252(a)(1).

     For the reasons set forth below, we **DISMISS** the petition for lack of subject-matter jurisdiction.

## BACKGROUND

Wright is a native and citizen of Jamaica. At some point in the past, he entered the United States illegally, but the record does not disclose when or where. Wright was granted lawful permanent resident ("LPR") status on August 29, 2005.

After obtaining LPR status, Wright was subsequently convicted of multiple crimes. Most prominently, in 2007, Wright was convicted in the Northern District of Ohio of perjury and submitting a false passport application after he bought, in 2000, a stolen Social Security number and a fake birth certificate to apply for a passport. He also has a California state conviction for drug trafficking after he was caught in possession of a large quantity of marijuana.

Because of these convictions, on August 23, 2013, the Department of Homeland Security issued a Notice to Appear charging Wright as removable under § 237(a) of the Immigration and Nationality Act. Wright conceded the factual allegations in the Notice to Appear and his removability, but filed applications for asylum, withholding of removal, and relief under the Convention Against Torture.

The IJ held an individual hearing on Wright's applications on February 17, 2016. Although the hearing was not transcribed, Wright concedes that the IJ's summary of his testimony is accurate:

> The following is a general summary of the Respondent's testimony offered at the hearing. Respondent was born August 5, 1970 in Montego Bay, Jamaica. He is Christian. The Respondent is legally married to Michelle Larson but they have been separated for eleven year[s]. He has a new girlfriend with whom he has two children ages ten and one. He has three other children. All of his children were born in the United States.
>
> The Respondent's mother is deceased. His father is 72 years old, lives in Jamaica and is a retired farmer. He has two sisters who still live in Montego Bay, Jamaica and one sister who lives in Toronto, Canada. He has a half-brother through his father whom he does not know. He has another brother, Troy Wright, who is deceased.
>
> His brother Troy, died on August 18, 2009 in Montego Bay, Jamaica. Troy worked running a car wash business. He also worked as a referee. He was well-known and had a nickname of GiGi Rat. Troy was killed at his house. He was holding a gun for a gang member, specifically an automatic machine gun. Another gang wanted the gun so they shot Troy although they did not get the gun. The police later found the gun. The police did not investigate Troy's death.

Troy had previously lived in the United States and had been deported back to Jamaica in 2008 due to criminal convictions involving guns. He had been back in Jamaica about one year before being killed.

After Troy was killed, some gang members contacted the Respondent's sister and obtained the Respondent's phone number. They called the Respondent and said he had to pay for the gun. The gang members started threatening the Respondent's family.

The Respondent believes if he went back to Jamaica, he would be killed. He would have to go to Montego Bay because that is the only place he knows. Also, if the Respondent is deported, he would have to check in with the police. He believes the police would hold him and torture him. The police would not protect him because they are involved in gangs.

The Respondent has two criminal convictions. He was convicted in federal court in Cleveland for perjury and a false passport application. He received two years of probation and six months house arrest. He bought a birth certificate and social security number and [then] applied for a passport in 2000. He was convicted in 2007. It turned out he had purchased a police officer's birth certificate.

His second conviction stems from an arrest in 2011 in California. He spent four months in jail and had two years of probation from this conviction. He had flown to California and a friend picked him up. While driving with this friend, the police stopped them and found marijuana in the car. It was a large quantity of marijuana. The driver of the car was also convicted and deported.

The Respondent previously worked as a tow truck operator but no longer has a license so has not been working for two years. His girlfriend works and travels a lot so he takes care of the children.

On cross examination, the Respondent clarified his California criminal case was from Orange County. He was convicted in August 2012.

His brother, Troy, was involved with the Bone Crusher gang or crew. The Respondent does not know the name of the rival gang because they were from another area. The Respondent believes the Bone Crusher crew would target him. It is people from the Bone Crusher who contacted the Respondent because the gun was expensive. They have contacted the Respondent 8 to 10 times. He knew the people calling were with the Bone Crusher crew because they told him. The first phone call he received was in September 2009 and the last call was about one month later because the Respondent changed his phone number. He has had no contact with them since October 2009.

The Respondent has had contact with his oldest sister, Anne Marie. She told him that late last year[], 2015, the Bone Crushers contacted her and told her that they still remember the Respondent because he talked tough.

The Respondent has a cousin, Sean, who died in 2014. He was shot in downtown Montego Bay but it is unknown who killed him. This cousin was close to Respondent's brother. The Respondent is not sure if he was involved with Bone Crusher crew but his cousin was also caught with a gun. No one else in Respondent's family was been harmed or threatened.

3

The Respondent believes that the police did not investigate his cousin's death. He believes the police are corrupt and affiliated with different gangs so they do not investigate certain crimes, including most gang crimes.

The Respondent's sister, Anne Marie, knows more details about what happened. His father knew nothing about the threats against him. He did not know to get a statement from his sister. His fiancée was in the room once or twice when he received phone calls but he kept the details from her.

Under questioning from the Court, the Respondent clarified that the problem is the Bone Crusher crew wants money from him. They would not ask his sister for the money or bother her because they would not go after a woman.

The Respondent's girlfriend, Shovan Gocan, also testified. She has been living with the Respondent for eleven years and they have two children together. She does IT training related to medical records and travels six months out the year.

Ms. Gocan knew the Respondent's brother, Troy Wright. She knew he was deported and then murdered at his home. She had heard it was gang related.

Ms. Gocan knows that after that the Respondent received phone calls from his family members but does not know the details. Once the Respondent'[s] sister called Ms. Gocan as she was trying to get ahold of the Respondent. She told Ms. Gocan what had happened and that the gang wanted money from the Respondent.

On cross examination, Ms. Gocan said the phone calls began within a few weeks of the death of Respondent's brother. The last phone call was years ago.

(App. R. 4, Administrative Record, at 29–31.)

On April 14, 2016, the IJ filed an order denying all of the relief requested by Wright. Relevant here, the IJ determined that Wright had failed to show that it was more likely than not that he would be tortured if returned to Jamaica. The IJ reasoned that Wright's fears that he would be harmed by the Bone Crusher gang or the police were speculative, particularly since he had not heard from the gang in several years.

On August 18, 2016, the BIA affirmed the IJ's order in a brief opinion, largely echoing the IJ's reasoning. On September 16, 2016, Wright filed a timely petition for review. Wright's petition challenges only the BIA's denial of relief under the Convention Against Torture.

**DISCUSSION**

"Article 3 of the Convention Against Torture prohibits the return 'of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the

instigation or with the acquiescence of such an official.'" *Mostafa v. Ashcroft*, 395 F.3d 622, 624–25 (6th Cir. 2005) (quoting *Matter of G-A-,* 23 I. & N. Dec. 366, 367 (BIA 2002) (en banc) (citations omitted)). Federal regulations define torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). As the BIA has explained,

> [i]n determining whether an alien is entitled to protection under the Convention Against Torture, all evidence relevant to the possibility of future torture in the proposed country of removal shall be considered, including, but not limited to: past torture inflicted upon the applicant; evidence that the applicant could relocate to another part of the country of removal where he or she is not likely to be tortured; gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in the country of deportation.

*Matter of G-A-*, 23 I. & N. Dec. at 367–68 (citing 8 C.F.R. § 208.16(c)(3)); *see also Mostafa*, 395 F.3d at 625.

Wright argues that the BIA erred in determining that he has not demonstrated his entitlement to relief under the Convention Against Torture. Before we may address Wright's claim for relief, however, we must first ascertain whether his claim is reviewable at all. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 strips courts of "jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" a wide variety of listed predicate offenses. 8 U.S.C. § 1252(a)(2)(C); *see also Ventura-Reyes v. Lynch*, 797 F.3d 348, 356–58 (6th Cir. 2015) (holding that the jurisdictional bar applies as long as an alien is removable, regardless of whether the predicate offense was the reason for removal). Wright concedes that he is removable because he committed a controlled-substance offense, two or more crimes involving moral turpitude, and an aggravated felony, as those terms are defined in the Immigration and Nationality Act.

Accordingly, we retain jurisdiction only to consider any "constitutional claims or questions of law raised upon" his petition for review. 8 U.S.C. § 1252(a)(2)(D).

Wright raises only one issue in this appeal. Specifically, he argues that the BIA and IJ erred by concluding, based on the evidence in the administrative record, that he failed to show that it was more likely than not that he would be tortured if returned to Jamaica. This is a factual argument that does not raise any legal or constitutional issues. We have repeatedly held that we lack jurisdiction to consider a challenge to the BIA's decision that an applicant failed to meet his burden to warrant relief under the Convention Against Torture. *See, e.g.*, *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006) (citing *Hamid v. Gonzales*, 417 F.3d 642 (7th Cir. 2005) for the proposition that courts lack jurisdiction to consider a "petitioner's CAT claim where he urge[s] the court to review whether the BIA correctly considered, interpreted, and weighed the evidence presented"); *Luambano v. Holder*, 565 F. App'x 410, 414 (6th Cir. 2014) (holding that the Court lacked jurisdiction to consider petitioner's argument that the "evidence in the record clearly establishes that he is more likely than not to face torture if removed" (citation, quotation marks, and brackets omitted)); *Arestov v. Holder*, 489 F. App'x 911, 917 (6th Cir. 2012) (same); *Bushati v. Gonzales*, 214 F. App'x 556, 558 (6th Cir. 2007) (same); *see also Bracamontes v. Holder*, 675 F.3d 380, 389–90 (4th Cir. 2012); *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 329 (2d Cir. 2006); *Martinez-Rosas v. Gonzales*, 424 F.3d 926, 930 (9th Cir. 2005). Accordingly, we lack jurisdiction to grant Wright the relief he seeks.

## CONCLUSION

For the foregoing reasons, we **DISMISS** Wright's petition for lack of subject matter jurisdiction.